# UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF NEW MEXICO

| | |
|---|---|
| In re: Roman Catholic Church of the Archdiocese of Santa Fe, | ) Chapter 11 )<br>) )<br>) Bankruptcy Case No. 18-13027-t11 |
| Debtor-in-Possession. | ) )<br>) Adv. Proc. No. 20-01058 |
| Official Committee of Unsecured Creditors, | ) )<br>) )<br>) |
| Plaintiff, | ) )<br>) |
| v. | ) )<br>) |
| The Archdiocese of Santa Fe Real Estate Corporation, as Trustee of the Archdiocese of Santa Fe Real Estate Trust, Shrine of Our Lady of Guadalupe – Santa Fe, Santa Maria de La Paz Catholic Community, Immaculate Conception - Albuquerque, Nuestro Senora de Guadalupe – Taos, St. John the Baptist – Santa Fe, Cristo Rey Parish, Church of the Ascension, Our Lady of Belen, St. Jude Thaddeus, Nativity of the Blessed Virgin Mary, and the Roman Catholic Church of the Archdiocese of Santa Fe, | ) )<br>) )<br>) )<br>) )<br>) )<br>) )<br>) )<br>) )<br>) )<br>) )<br>) |
| Defendants. | ) )<br>) |
| Official Committee of Unsecured Creditors, | ) Adv. Proc. No. 20-01059-t )<br>) |
| Plaintiff,<br>v. | ) )<br>) )<br>) |
| Roman Catholic Church of the Archdiocese of Santa Fe , et al., | ) )<br>) )<br>) |
| Defendants. | ) )<br>) |

|                                                      |   |                         |
| ---------------------------------------------------- | - | ----------------------- |
| Official Committee of Unsecured Creditors,           | ) | Adv. Proc. No. 20-01061-t |
|                                                      | ) |                         |
| Plaintiff,                                           | ) |                         |
|                                                      | ) |                         |
| v.                                                   | ) |                         |
|                                                      | ) |                         |
| The Roman Catholic Church of the Archdiocese         | ) |                         |
| 0f Santa Fe, Rev. Msgr. Lambert J. Luna, Rev.        | ) |                         |
| John Cannon, Rev. Timothy A. Martinez, Rev.          | ) |                         |
| Clarence Maes, Rev. John Trambley, Very Rev.         | ) |                         |
| James Marshall, Rev. Msgr. Bennett J. Voorhies,      | ) |                         |
| Tony Salgado, Jennifer Cantrell, Bernard E.          | ) |                         |
| "Gig" Brummell, and Stan Sluder, Solely in           | ) |                         |
| Their Capacity as Trustees of the Archdiocese of     | ) |                         |
| Santa Fe Deposit and Loan Fund, Nativity of the      | ) |                         |
| Bless Virgin Mary, Our Lady of the                   | ) |                         |
| Annunciation, Our Lady of the Assumption –           | ) |                         |
| Albuquerque, Risen Savior Catholic Community,        | ) |                         |
| Our Lady of Belen, Immaculate Heart of Mary,         | ) |                         |
| San Clemente, St. John Vianney Church, St.           | ) |                         |
| Thomas Aquinas, and San Miguel,                      | ) |                         |
|                                                      | ) |                         |
| Defendants.                                          | ) |                         |

**MOTION OF THE OFFICIAL COMMITTEE OF UNSECURED
CREDITORS FOR PARTIAL SUMMARY JUDGMENT ON AFFIRMATIVE
DEFENSES BASED ON (A) THE RELIGIOUS FREEDOM RESTORATION ACT
OF 1993 (42 U.S.C. § 2000bb et seq.), (B) THE CHURCH AUTONOMY DOCTRINE,
AND (C) THE FIRST AMENDMENT TO THE UNITED STATES CONSTITUTION**

# **TABLE OF CONTENTS**

**Page**

I. INTRODUCTION ................................................................................................... 1

II. UNDISPUTED FACTS ........................................................................................ 6

III. ARGUMENT ...................................................................................................... 12

    A.    Legal Standard for Summary Judgment. ............................................. 12

    B.    Summary Judgment Is Mandated on the RFRA Affirmative Defense. ............... 14

        1.    RFRA Does Not Create a Cause of Action or Defense Against Non-Government Actors........................................................ 14

            a.    The plain language of RFRA only permits a defense against "a government." ................................ 15

            b.    The Committee is not a government under RFRA. .................... 19

            c.    The Committee is not a government actor under RFRA because it is neither acting "under color of law" nor "willfully participating in joint action with government officials." .................................................... 20

        2.    RFRA May Not Be Applied to Modify or Preempt State Law............... 23

        3.    *In re Young* is Distinguishable. ............................................. 26

        4.    RFRA Does Not Bar the Committee's Claims Because the Bankruptcy Code and Its Provisions for Recovery of Fraudulent Transfers Serve a Compelling Government Interest................................ 29

    C.    The So-Called Church Autonomy Doctrine Defenses Fail as a Matter of Law. .................................................................................. 31

        1.    The So-Called Church Autonomy Doctrine Only Applies to Intra-church Disputes That Require a Court to Determine Matters of Religious Doctrine or Belief. ........................................... 31

        2.    Application and Interpretation of Canon Law to Determine the Status of Estate Property Would Impermissibly Entangle the Court in Religious Doctrine. ............................................... 36

        3.    The Church Autonomy Doctrine Has Been Rejected by Every Court That Has Considered It in a Diocesan Bankruptcy Case. .............. 39

    D.    Summary Judgment Must Be Granted Against Defendants on the First Amendment Defense. ......................................................................... 43

        1.    As a Matter of Law, the Complaints Do Not Violate the Free Exercise Clause. ...................................................................... 44

2. As a Matter of Law, the Complaints Do Not Violate the Establishment Clause. ............................................................................ 47

IV. CONCLUSION ......................................................................................................... 49

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### CASES

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ................................................................................. 13

*Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.*,
912 F.2d 1238 (10th Cir. 1990) ................................................................. 13

*Bauchman v. West High School*,
132 F.3d 542 (10th Cir. 1997) ................................................................... 48

*Bd. of Cty. Commissioners v. Suncor Energy (USA) Inc.*,
965 F. 3d 792 (10th Cir. 2020) ................................................................. 18

*Bob Jones Univ. v. United States*,
461 U. S. 574 (1983) ................................................................................. 44

*Boerne v. Flores*,
521 U.S. 507 (1997) ............................................................................ passim

*Bowen v. Roy*,
476 U. S. 693 (1986) ................................................................................. 44

*Boyko v. Parker*,
960 F. Supp. 2d 1270 (D. Utah 2013) ....................................................... 14

*Brownson v. Bogenschultz*,
966 F. Supp. 795 (E.D. Wis. 1997) ........................................................... 21

*Bryce v. Episcopal Church in the Diocese of Colorado*,
289 F.3d 648 (10th Cir. 2002) ........................................................ 5, 34, 42

*Butner v. United States*,
440 U.S. 48 (1979) ................................................................................... 24

*Cantwell v. Conn.*,
310 U.S. 296 (1940) .............................................................................. 6, 35

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) ................................................................................. 13

*Christians v. Crystal Evangelical Free Church*
*(In re Young)*,
82 F.3d 1407 (8th Cir. 1996), *vacated* 521 U.S. 1114 (1997),
*reinstated by* 141 F.3d 854 (8th Cir. 1998), *cert. denied,* 525 U.S. 811 (1998) ................ passim

*Church of Lukumi Babalu Aye v. City of Hialeah*,
508 U.S. 520 (1993) ............................................................................ 45-46

*Comm. of Tort Litigants v. Catholic Diocese of Spokane*
  *(In re Catholic Bishop of Spokane),*
  329 B.R. 304 (Bankr. E.D. Wash. 2005),
  *rev'd in part on other grounds,* 364 B.R. 81 (E.D. Wash. 2006). ................................ 26, 41-42

*Conrad v. Phone Directories Co.,*
  585 F. 3d 1376 (10th Cir. 2009) ................................................................ 15

*Doe v. Archdiocese of Denver,*
  413 F. Supp. 2d 1187 (D. Colo. 2006) ........................................................ 6

*EEOC v. Catholic Univ. of Am.,*
  83 F.3d 455 (D.C. Cir. 1996) .................................................................. 17-18

*Employment Div., Dept. of Human Resources of Ore. v. Smith,*
  494 U. S. 872 (1990) .......................................................................... 35, 44-45

*Everson v. Board of Education,*
  330 U.S. 1 (1947) ................................................................................ 47

*Gallagher v. Neil Young Freedom Concert,*
  49 F.3d 1442 (10th Cir. 1995) ................................................................ 22

*Gen. Conference Corp. of Seventh-Day Adventists v. McGill,*
  617 F.3d 402 (6th Cir. 2010) ............................................................... 3, 16

*Gen. Council on Fin. & Admin. v. Cal. Superior Court,*
  439 U.S. 1369 (1978) ............................................................................ 35

*Gonzalez v. Roman Catholic Archbishop,*
  280 U.S. 1 (1929) ............................................................................... 35

*Hankins v. Lyght,*
  441 F.3d 96 (2d Cir. 2006) ................................................................... 17-18

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC,*
  565 U.S. 171 (2012) ............................................................................. 32

*Houston v. Mile High Adventist Acad.,*
  846 F. Supp. 1449 (D. Colo. 1994) ........................................................ 37

*Hubbard v. J Message Grp. Corp.,*
  325 F. Supp. 3d 1198 (D.N.M. 2018) .................................................... 37

*Hunt v. Pick,*
  240 F. 2d 782 (10th Cir. 1957) ............................................................ 13

*In re Bayou Group,* LLC,
  564 F.3d 541 (2d Cir. 2009) ................................................................ 23

*In re Columbia Gas Sys., Inc.,*
  33 F.3d 294 (3d Cir. 1994) .................................................................. 23

*In re Farmers Ins. Co.,*
  738 F. Supp. 2d 1180 (W.D. Okla. 2010) ............................................. 14

iv

*In re Lobera*,
454 B.R. 824 (Bankr. D.N.M. 2011) .................................................................... 15

*In re Meyer*,
467 B.R. 451 (Bankr. E.D. Wis. 2012) ............................................................ 30, 47

*In re Navarro*,
83 B.R. 348 (Bankr. E.D. Pa. 1988) ..................................................................... 30

*In re SPM Mfg. Corp.*,
984 F.2d 1305 (1st Cir. 1993) .............................................................................. 23

*Jackson v. Metro Edison Co.*,
419 U.S. 345 (1974) .............................................................................................. 22

*Jones v. Wolf*,
443 U.S. 595 (1979) ....................................................................................... passim

*Kedroff v. Saint Nicholas Cathedral of Russian Orthodox Church*,
344 U.S. 94 (1952) ........................................................................................... 32, 34

*Kreshik v. Saint Nicholas Cathedral of Russian Orthodox Church*,
363 U.S. 190 (1960) .............................................................................................. 34

*Lee v. Weisman*,
505 U.S. 577 (1992) .............................................................................................. 47

*Lemon v. Kurtzman*,
403 U.S. 602 (1971) ......................................................................................... 47-48

*Listecki v. Off. Comm. of Unsecured Creditors*,
780 F. 3d 731 (7th Cir. 2015) ......................................................................... passim

*Mathis v. Christian Heating & Air Conditioning, Inc.*,
158 F. Supp. 3d 317 (E.D. Pa. 2016) ................................................................... 16

*McDaniel v. Paty*,
435 U.S. 618 (1978) .......................................................................................... 6, 35

*Mitchell v. Helms*,
530 U.S. 793 (2000) .............................................................................................. 37

*Morris v. Midway S. Baptist Church*
*(In re Newman)*,
183 B.R. 239 (Bankr. D. Kan. 1995), *aff'd*, 203 B.R. 468 (D. Kan. 1996) ...................... passim

*Our Lady of Guadalupe School v. Morrissey-Berru*,
140 S. Ct. 2049 (2020) ...................................................................................... 4, 32

*Pino v. Higgs*,
75 F.3d 1461 (10th Cir.1996) ............................................................................... 22

*Presbyterian Church in U.S. v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church*,
393 U.S. 440 (1969) ...................................................................................... 32-33, 39

*Prince v. Massachusetts*,
321 U.S. 158 (1944) .............................................................................................. 44

*Reynolds v. U.S.*,
 98 U.S. 145 (1879) ............................................................................................. 35

*Rweyemamu v. Cote*,
 520 F.3d 198 (2d Cir. 2008) ........................................................................... 17-18

*Serbian E. Orthodox Diocese v. Milivojevich*,
 426 U.S. 696 (1976) ...................................................................................... 32, 34

*Smart World Techs., LLC v. Juno Online Services*,
 423 F.3d 166 (2d Cir. 2005) ............................................................................... 23

*Snyder v. Murray City Corp.*,
 159 F.3d 1227 (10th Cir. 1998) .......................................................................... 47

*Sutton v. Providence St. Joseph Med. Ctr.*,
 192 F.3d 826 (9th Cir. 1999) .................................................................... 3, 16, 21

*Tanvir v. Tanzin*, 894 F.3d 449 (2d Cir. 2018) ...................................................... 21

*Tony and Susan Alamo Foundation v. Secretary of Labor*,
 471 U.S. 290 (1985) ............................................................................................ 44

*Tort Claimants v. Roman Catholic Archbishop of Portland*,
 335 B.R. 842 (Bankr. D. Or. 2005) ............................................................. passim

*United States v. Lee*,
 455 U.S. 252 (1982) ............................................................................................ 44

*Universal Money Ctrs., Inc. v. AT&T*,
 22 F.3d 1527 (10th Cir. 1994) ............................................................................ 13

*Van Stry v. McCrea*,
 2020 U.S. Dist. LEXIS 62338 (E.D. Tex. Apr. 9, 2020) .................................... 16

*Wadsworth v. Word of Life Christian Ctr.*
 *(In re McGough)*,
 737 F. 3d 1268 (10th Cir. 2013) ..................................................................... 28-29

*Watson v. Jones*,
 80 U.S. 679 (1871) ...................................................................................... 32-33, 37

*Weinbaum v. City of Las Cruces, N.M.*,
 541 F.3d 1017 (10th Cir. 2008) .......................................................................... 48

*Weinman v. Word of Life Christian Ctr.*
 *(In re Bloch)*,
 207 B.R. 944 (D. Colo. 1997) ............................................................................. 28

*Wolf v. Prudential Ins. Co. of Am.*,
 50 F. 3d 793 (10th Cir. 1995) ............................................................................. 13

DOCS_SF:105147.4 05066/002

## STATUTES

11 U.S.C. § 101 ................................................................................................... 20

11 U.S.C. § 541 ............................................................................................. passim

11 U.S.C. § 542 ............................................................................................. 29, 44

11 U.S.C. § 544 ............................................................................................. passim

11 U.S.C. § 548 ............................................................................................. passim

11 U.S.C. § 1103 ................................................................................................ 22

42 U.S.C. § 1983 ................................................................................................ 21

42 U.S.C. § 2000bb ....................................................................................... passim

NMSA § 46A-5-505 ...................................................................................... 24, 44

NMSA § 46A-6-603 ...................................................................................... 24, 44

## OTHER AUTHORITIES

Marci A. Hamilton, *Foundations of Church Autonomy: Article:*
   *Religious Institutions, the No-Harm Doctrine, and the Public Good,*
   2004 B.Y.U.L. Rev. 1099 (2004) ................................................................ 4, 31

RLCDPA, Pub. L. No. 105-183 §§ 2, 3(a), June 19, 1998, 112 Stat. 517 ............................ 27, 28

The Official Committee of Unsecured Creditors (the "Committee") of The Roman

Catholic Church of the Archdiocese of Santa Fe ("ASF")[1] brings this motion for partial summary

judgment to narrow issues before the Court at the outset of litigation, substantially reduce the

scope and costs of discovery, reduce costs, and to increase the likelihood of settlement.  The

Committee seeks partial summary judgment dismissing the affirmative defenses asserted by the

Defendants[2]  based on the Religious Freedom Restoration Act of 1993 (42 U.S.C. § 2000bb *et*

*seq.*)  ("RFRA"), the so-called "Church Autonomy Doctrine," and the First Amendment to the

United States Constitution (the "First Amendment") on the grounds that these defenses have no

application as a matter of law to the claims for relief alleged in the Complaints.

# I.
# INTRODUCTION

In late 2007, in the face of escalating claims of clergy sex abuse  by childhood sexual

abuse survivors, ASF began preparations for a corporate restructuring (the "Restructuring")  to

place hundreds of millions of dollars of its assets beyond the reach of its creditors, while

ensuring that the Archbishop remained in control of the assets.  The Restructuring involved the

incorporation of previously unincorporated parishes and the formation of two revocable self-

settled trusts (the "Trusts") controlled by ASF: the RE Trust for the receipt of ASF's real estate,

---

[1] All capitalized terms not otherwise defined have the meanings set forth in the following complaints: *Complaint for Avoidance and Recovery of Fraudulent Transfers, and for Declaratory and Injunctive Relief* [Adv. Proc. No. 20-ap-01059, Docket No. 1] (the "RE Trust Complaint"), *Complaint for Avoidance of Unrecorded Interests in Real Property and Quiet Title* [Adv. Proc. No. 20-ap-01059, Docket No. 1] (the "Unrecorded Interests Complaint"), and *Complaint for Avoidance and Recovery of Fraudulent Transfers, and for Declaratory and Injunctive Relief* [Adv. Proc. No. 20-ap-01061] (the "DLF Trust Complaint") (collectively, the "Complaints" filed in the "Adversary Proceedings").

[2] The Defendants are ASF, the Archdiocese of Santa Fe Real Estate Corporation ("RE Corp."), as trustee of the Archdiocese of Santa Fe Real Estate Trust ("RE Trust"), trustees of the Archdiocese of Santa Fe Deposit and Loan Fund (the "DLF Trust"), and certain representative parishes (the "Parishes").

and the DLF Trust for the receipt of financial assets. Between 2013 and 2018, ASF made massive transfers of its assets to the RE Trust and the DLF Trust without consideration. As of the petition date of ASF's bankruptcy, the Parishes were separately incorporated, ASF's financial assets had been transferred to the DLF Trust, the newly incorporated parishes were the beneficiaries of the Trusts, and most (but not all) of ASF's real estate had been transferred to the RE Trust. ASF disclaims any interest in the assets held in the Trusts. ASF also disclaims any interest in real properties that remain titled to ASF, asserting that such properties are held in an equitable trust for the benefit of the Parishes.

On May 29, 2020, the Committee filed a motion ("Standing Motion") for authority to commence, prosecute, and settle on behalf of ASF's estate the claims set forth in the Complaints. The Complaints seek (i) to avoid fraudulent transfers to the Trusts, (ii) declaratory and injunctive relief that the Trusts are self-settled and therefore subject to the claims of ASF's creditors under New Mexico law, and (iii) to avoid alleged unrecorded interests of the Parishes in real property pursuant to Bankruptcy Code section 544(a)(3). The Committee requested that ASF pursue the claims set forth in the Complaints, but ASF refused.

On October 9, 2020, following briefing and arguments by counsel, the Court issued an Opinion ("Opinion") and Order [Bankr. Docket Nos. 514-15] granting the Standing Motion. The Committee filed the three Complaints to avoid the transfers to the Trusts, to determine that the Trust assets are property of the estate under New Mexico law, and to avoid the unrecorded alleged beneficial interests of the Parishes in real property that remains titled to ASF.[3] The

---

[3] Pursuant to initial scheduling orders entered in the above-captioned Adversary Proceedings, the Court has invited, but not required, the filing of this motion for partial summary judgment relating to the Religious Liberty Defenses,

Trusts and Parishes contend that avoiding the transfers of assets to the Trusts pursuant to New Mexico fraudulent transfer law, or applying any provision of the Bankruptcy Code or New Mexico law by which the assets in the Trusts could be determined to be property of ASF's estate, would substantially burden their free exercise of religion in violation of RFRA and the First Amendment. As a matter of law, RFRA, the so-called Church Autonomy Doctrine, and First Amendment defenses (collectively, the "Religious Liberty Defenses") do not apply to bar any of the claims asserted in the Complaints.

RFRA provides defense only against "a government" and is inapplicable to suits to which the government is not a party. Three United States Courts of Appeals have concluded that the statutory language makes clear that Congress intended RFRA to apply only in cases where the "government" is a party. *Listecki v. Official Comm. of Unsecured Creditors,* 780 F.3d 731, 737 (7th Cir. 2015); *Gen. Conference Corp. of Seventh-Day Adventists v. McGill,* 617 F.3d 402, 411-12 (6th Cir. 2010); *Sutton v. Providence St. Joseph Med. Ctr.*, 192 F.3d 826, 834 (9th Cir. 1999).

The Committee is a private non-government entity that stands in the shoes of the Debtor's estate, which is also a non-government actor. *Listecki* 780 F.3d at 737-741). Therefore, RFRA cannot provide a defense to claims asserted by the Committee on behalf of the estate. Nor may RFRA be applied to state law, such as the New Mexico fraudulent transfer, corporate, and trust laws that govern the claims set forth in the Complaints.

---

and stayed all discovery between the parties pending further orders. The parties have stipulated to consolidation of the adversary proceedings pursuant to Bankruptcy Rule 7042 and Federal Rule of Civil Procedure 42(a)(1) for purposes of filing and resolution of this motion. [Adv. Pro. No. 20-ap-01058; Docket No. 22].

Defendants urge the application of the so-called Church Autonomy Doctrine defenses to defeat the estate's fraudulent transfer claims against the Trusts.[4]  The purported church autonomy cases Defendants relied upon in opposing the Standing Motion declined to decide solely ecclesiastical disputes (*i.e.,* intra-organizational disputes over religious beliefs or internal governance).  These cases do not stand for the right of a religious organization to act with independence from civil law, but rather for the principle that courts may not decide matters of religious belief or church government.

 Defendants' argument is that the challenged transfers were not of property of the estate because at the time of the transfers, the transferred assets were held in pre-existing equitable trusts for the benefit of the unincorporated Parishes.  Under New Mexico law, the Parishes had no legal existence separate from ASF prior to their incorporation (which ASF has acknowledged, *infra* at Undisputed Facts) and could not be trust beneficiaries.  Defendants argue the Church Autonomy Doctrine requires this Court to disregard New Mexico law and instead apply canon law, and to find that the unincorporated Parishes were "juridic" entities and therefore could be trust beneficiaries.

The Supreme Court has repeatedly held that ecclesiastical abstention, grounded in the First Amendment, only applies to internal church disputes and cannot be applied to prevent the

---

[4] The Supreme Court does not use this label. *See* Marci A. Hamilton, *Foundations of Church Autonomy: Article: Religious Institutions, the No-Harm Doctrine, and the Public Good,* 2004 B.Y.U.L. Rev. 1099, 1113 n. 50-51 (2004) ("The Supreme Court has never used the phrase to describe its jurisprudence, and it appears in the Supreme Court's cases only twice solely as footnote references to law review articles;" explaining that the term was popularized among academics in 1981).  Recently, in *Our Lady of Guadalupe School v. Morrissey-Berru,* 140 S. Ct. 2049, 2061 (2020), the Supreme Court referred for the first time to the "general principle of church autonomy" as "independence in matters of faith and doctrine and in closely linked matters of internal government."  The *Morrissey-Berru* case involved application of the ministerial exception to an employment dispute between a church and one of  its ministers.

application of neutral and generally applicable civil law to resolve disputes with the secular world.  Indeed, the Supreme Court has rejected the idea that fraudulent or improper actions can ever be excused in the name of religion.  The Tenth Circuit has held that a threshold issue for application of the Church Autonomy Doctrine is whether the challenged conduct is "rooted in religious belief."  *Bryce v. Episcopal Church in the Diocese of Colorado*, 289 F.3d 648, 657 (10th Cir. 2002).  Here, ASF's transfers to the Trusts were divorced from religious belief and done as part of a sophisticated asset protection scheme to avoid liability for enabling the sexual abuse of children.  As this Court correctly observed, the Adversary Proceedings do not raise the kind of intra-church dispute that the Church Autonomy Doctrine protects from court interference.  Opinion at 15.

Summary judgment is mandated to ensure this Court will not impermissibly entangle itself in the interpretation and application of ecclesiastical law.  Application of the Church Autonomy Doctrine, as urged by the Defendants, would require the Court to apply and interpret canon law to determine the rights of secular creditors to recover fraudulent transfers from a religious entity and determine what constitutes property of the estate.  The Supreme Court has cautioned against this type of entanglement in religious matters when, as here, the dispute can be resolved by application of neutral principles of civil law.

ASF filed a voluntary petition, electing to submit itself to the bankruptcy process and  to take full advantage of the automatic stay, discharge, and other provisions of the Bankruptcy Code that increase its leverage over its creditors.  By their Church Autonomy Doctrine and First Amendment defenses, Defendants seek to cherry-pick provisions of the integrated Bankruptcy

5DOCS_SF:105147.4 05066/002

Code under the cover of religious freedom to immunize themselves from liability and accountability to the survivors of childhood sex abuse. Identical arguments have been raised in other diocesan chapter 11 cases and have been uniformly rejected. It is beyond dispute that the torts of, and fraudulent transfers to, religious entities are subject to secular legal remedies.[5]

Finally, summary judgment must be granted against the First Amendment defense. Under well-settled Supreme Court precedent, application of neutral, generally applicable provisions of the Bankruptcy Code and New Mexico law to resolve the claims asserted in the Complaints violates neither the Free Exercise nor the Establishment clauses of the First Amendment.

## II.
## UNDISPUTED FACTS

### The Parishes Incorporate

1. In or about May 2009, ASF prepared a PowerPoint presentation entitled, "Parish Incorporation." A slide entitled, "Advantages of Incorporation," described the Parishes at that time as unincorporated associations, no independent legal status, and no recognized identity under civil law. Declaration of Kenneth Brown filed herewith ("Brown Declaration"), Exhibit A; *see also* Declaration of Tony Salgado filed June 26, 2020 [Bankr. Docket No. 420] ("Salgado

---

[5] *See, e.g., Cantwell v. Conn.,* 310 U.S. 296, 306 (1940) (fraudulent or improper actions are not excused in the name of religion); *McDaniel v. Paty,* 435 U.S. 618, 643 n.* (1978) (Stewart, J., concurring) ("[A]cts harmful to society should not be immune from proscription simply because the actor claims to be religiously inspired."); *Listecki v. Off. Comm. of Unsecured Creditors,* 780 F.3d 731, 749 (7th Cir. 2015) ("We do not believe that there is, nor can there be, a religious exception that would allow a fraudulent conveyance in the name of free exercise."); *Doe v. Archdiocese of Denver,* 413 F. Supp. 2d 1187, 1193 (D. Colo. 2006) ("The general duty of care [owed to sex abuse victims] depends in no way upon the religious status of the defendant organizations.").

Declaration"), ¶ 11 (preparation of PowerPoint prior to Restructuring), attached as Exhibit B to Brown Declaration.[6]

2.     The Parishes were first incorporated beginning in 2012 and the incorporations were completed by January 1, 2013.  ASF Answer to RE Trust Complaint, ¶ 1.  Prior to the Restructuring, the Parishes were not incorporated.  Parish Answer to RE Trust Complaint, ¶ 1.[7]

3.     According to ASF's longtime Chief Financial Officer, ASF's motivation for incorporating the Parishes included "the reasonable and prudent protection of Parish assets with regard to abuse claims and other types of claims."  Brown Declaration at Exhibit B, Salgado Declaration, ¶ 9.

**The Bankruptcy**

4.     On December 3, 2018 (the "Petition Date"), ASF filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  Voluntary Petition [Bankr. Docket No. 1].

5.     On December 18, 2018, the United States Trustee appointed the Committee to represent ASF's unsecured creditors.  The Committee is comprised of persons appointed by the United States Trustee.  [Bankr. Docket No. 53].

---

[6] Exhibits A and B attached to the Brown Declaration are provided for the Court's convenience and were previously filed at Bankr. Docket Nos. 389 and 420, respectively.

[7] Answers to the RE Trust Complaint [Adv. Proc. No. 20-ap-01058] were filed by ASF [Docket No. 15], the Parishes and RE Corp. [Docket No. 13], and Santa Maria de la Paz [Docket No. 14]; answers to the Unrecorded Interests Complaint [Adv. Proc. No. 20-ap-01059] were filed by ASF [Docket No. 13] and the Parishes [Docket No. 12]; and Answers to the DLF Complaint [Adv. Proc. No. 20-ap-01061] were filed by ASF [Docket No. 8] and the Parishes and trustees of the DLF Trust [Docket No. 7].

**The Adversary Complaints and Affirmative Defenses**

6.     On October 16, 2020, the Committee filed the RE Trust Complaint against RE

Corp. as trustee of the RE Trust, ASF, and the Parishes, commencing adversary proceeding

number 20-01058-t.  The RE Trust Complaint includes the following causes of action:

- First Claim for Relief: Avoidance and Recovery of RE Trust Transfers against RE Corp. and the Parishes pursuant to Bankr. Code §§ 544(b) and 550, N.M. Stat. § 56-10-18A(1);

- Second Claim for Relief: Avoidance and Recovery of RE Trust Transfers against RE Corp. and the Parishes pursuant to Bankr. Code §§ 544(b) and 550, N.M. Stat. § 56-10-18A(2);

- Third Claim for Relief: Avoidance and Recovery of RE Trust Transfers against RE Corp. and the Parishes pursuant to Bankr. Code §§ 544(b) and 550, N.M. Stat. § 56-10-19;

- Fourth Claim for Relief: Avoidance and Recovery of Incorporation Transfers against RE Corp. and the Parishes pursuant to Bankr. Code §§ 544(b) and 550, N.M. Stat. § 56-10-18A(1);

- Fifth Claim for Relief: Avoidance and Recovery of Incorporation Transfers against RE Corp. and the Parishes pursuant to Bankr. Code §§ 544(b) and 550, N.M. Stat. § 56-10-18A(2);

- Sixth Claim for Relief: Avoidance and Recovery of Incorporation Transfers against RE Corp. and the Parishes pursuant to Bankr. Code §§ 544(b) and 550, N.M. Stat. § 56-10-19;

- Seventh Claim for Relief: Avoidance and Recovery of RE Trust Transfers against RE Corp. and the Parishes pursuant to Bankr. Code §§ 548(e) and 550;

- Eighth Claim for Relief: Turnover of Assets in the RE Trust against RE Corp. and the Parishes pursuant to Bankr. Code §§ 541, 542, 544, and N.M. Stat. § 46A-5-505(A)(1);

- Ninth Claim for Relief: Turnover of Assets in the RE Trust against RE Corp. and the Parishes pursuant to Bankr. Code §§ 541, 542, 544, and N.M. Stat. § 46A-5-505(A)(2);

- Tenth Claim for Relief: Declaratory Relief that Assets in the RE Trust are property of ASF's Estate against all Defendants pursuant to Bankr. Code § § 541(a)(1), 544(a), and N.M. Stat. § 46A-5-505(A)(1) and (A)(2);

- Eleventh Claim for Relief: Injunctive Relief Compelling ASF to Revoke the RE Trust and Compelling RE Corp. as Trustee to Turn Over the Assets in the RE Trust pursuant to N.M. Stat. § 46A-6-603 and Bankr. Code § 541(a)(1); and

- Twelfth Claim for Relief: Declaratory Relief that the RE Trust is Void against all Defendants pursuant to Bankr. Code § 541(a)(1).

7. On October 16, 2020, the Committee filed the Unrecorded Interests Complaint against ASF and the Parishes, commencing adversary proceeding number 20-01059-t. The Unrecorded Interests Complaint includes the following causes of action:

- First Claim for Relief: Avoidance pursuant to 11 U.S.C. § 544(a)(3) against the Parishes; and

- Second Claim for Relief: Quiet Title against all Defendants.

8. On October 29, 2020, the Committee filed the DLF Trust Complaint against the trustees of the DLF Trust, ASF, and the Parishes, commencing adversary proceeding number 20-01061-t. The DLF Trust Complaint is similar to the RE Trust Complaint and includes the following causes of action:

- First Claim for Relief: Avoidance and Recovery of DLF Trust Transfers against the Trustees and Parishes pursuant to Bankr. Code §§ 544(b) and 550, N.M. Stat. § 56-10-18A(1);

- Second Claim for Relief: Avoidance and Recovery of DLF Trust Transfers against the Trustees and Parishes pursuant to Bankr. Code §§ 544(b) and 550, N.M. Stat. § 56-10-18A(2);

- Third Claim for Relief: Avoidance and Recovery of DLF Trust Transfers against the Trustees and Parishes pursuant to Bankr. Code §§ 544(b) and 550, N.M. Stat. § 56-10-19;

- Fourth Claim for Relief: Avoidance and Recovery of Incorporation Transfers against the Trustees and Parishes pursuant to Bankr. Code §§ 544(b) and 550, N.M. Stat. § 56-10-18A(1);

- Fifth Claim for Relief: Avoidance and Recovery of Incorporation Transfers against the Trustees and Parishes pursuant to Bankr. Code §§ 544(b) and 550, N.M. Stat. § 56-10-18A(2);

- Sixth Claim for Relief: Avoidance and Recovery of Incorporation Transfers against the Trustees and Parishes pursuant to Bankr. Code §§ 544(b) and 550, N.M. Stat. § 56-10-19;

- Seventh Claim for Relief: Avoidance and Recovery of DLF Trust Transfers against the Trustees and Parishes pursuant to Bankr. Code §§ 548(e) and 550;

- Eighth Claim for Relief: Turnover of Assets in the DLF Trust against the Trustees and Parishes pursuant to Bankr. Code §§ 541, 542, 544, and N.M. Stat. § 46A-5-505(A)(1);

- Ninth Claim for Relief: Turnover of Assets in the DLF Trust against the Trustees and Parishes pursuant to Bankr. Code §§ 541, 542, 544, and N.M. Stat. § 46A-5-505(A)(2);

- Tenth Claim for Relief: Declaratory Relief that Assets in the DLF Trust are property of ASF's Estate against all Defendants pursuant to Bankr. Code §§ 541(a)(1), 544(a), and N.M. Stat. § 46A-5-505(A)(1) and (A)(2);

- Eleventh Claim for Relief: Injunctive Relief Compelling ASF to Revoke the DLF Trust and Compelling the Trustees to Turn Over the Assets in the DLF Trust pursuant to N.M. Stat. § 46A-6-603 and Bankr. Code § 541(a)(1); and

- Twelfth Claim for Relief: Declaratory Relief that the DLF Trust is Void against all Defendants pursuant to Bankr. Code § 541(a)(1).

9.     On November 30, 2020, the Defendants filed answers to the Complaints, including a separate answer filed in response to the RE Trust Complaint by an individual Parish defendants, Santa Maria de La Paz Catholic Community (the "Santa Maria de la Paz Answer"), for a total of seven answers.

10.     By their answers, the Defendants raise the following Religious Liberty Defenses to the Complaints:

| Affirmative Defense: RFRA | Defendant's Answer/ Paragraph |
|---|---|
| a.   Plaintiff's claims are barred by the Religious Freedom Restoration Act. | ASF Answer to RE Trust Complaint, ¶ 10.<br><br>Parish Answer to RE Trust Complaint, ¶ 10.<br><br>Santa Maria de la Paz Answer to RE Trust Complaint, ¶ 9.<br><br>ASF Answer to Unrecorded Interests Complaint, ¶ 6.<br><br>ASF Answer to DLF Complaint, ¶ 7.<br><br>Parish Answer to DLF Complaint, ¶ 10. |
| **Affirmative Defense: Church Autonomy Doctrine and/or First Amendment[8]** | |
| b.   The documents referenced in the Complaint, including the Bylaws of the RE Corp. and the Indenture of Trust Archdiocese of Santa Fe Real Estate Trust must be read and interpreted with reference to Canon Law, which is the internal legal system of the Roman Catholic Church, and which bears upon all actions of the Archdiocese. | ASF Answer to RE Trust Complaint, ¶ 5.<br><br>Parish Answer to RE Trust Complaint, ¶ 5. |
| c.   The documents referenced in the Complaint, including the Bylaws [of the Archdiocese of Santa Fe Deposit and Loan Fund] and the Indenture of Trust [Archdiocese of Santa Fe Deposit and Loan Fund] must be read and interpreted with reference to Canon Law, which is the internal legal system of the Roman Catholic Church, and which bears upon all actions of the Archdiocese [and the Parishes]. | ASF Answer to DLF Complaint, ¶ 5.<br><br>Parish Answer to DLF Complaint, ¶ 5 (includes bracketed language). |
| d.   In the causes of action in the Complaint, the UCC requests that the Court interfere with and disregard the | ASF Answer to RE Trust Complaint, ¶ 7. |

---

[8] The Committee seeks summary judgment as to affirmative defenses set forth at subparagraphs (b) and (c) only to the extent that they are asserted to preclude the application of neutral law to resolve the disputes raised in the Adversary Proceedings. At the present time, the Committee is not seeking summary judgment on the issue of whether canon law may be considered in determining if an equitable trust was intended between ASF and the Parishes, if it is determined that the Parishes were capable of being trust beneficiaries. For reasons set forth in the summary adjudication motion filed concurrently herewith, the Committee contends that the Court need never reach the factual issue of whether equitable trusts existed because the unincorporated parishes were not legal entities separate from ASF, and under New Mexico law, the Parishes lacked the legal capacity to be trust beneficiaries.

| | |
|---|---|
| Archdiocese's ecclesiastical structure and governance in violation of the First Amendment to the United States Constitution, which protects the rights of religious organizations to adhere to their own ecclesiastical governments, thereby barring the relief requested in the Complaint. | Parish Answer to RE Trust Complaint, ¶ 7.<br><br>ASF Answer to Unrecorded Interests Complaint, ¶ 7.<br><br>Parish Answer to DLF Complaint, ¶ 7. |
| e.   The relief prayed for in the Complaint by the UCC requests that the Court violate the religious autonomy doctrine protected by the First Amendment of the United States Constitution. | ASF Answer to RE Trust Complaint, ¶ 8.<br><br>Parish Answer to RE Trust Complaint, ¶ 8.<br><br>ASF Answer to Unrecorded Interests Complaint, ¶ 8.<br><br>ASF Answer to DLF Complaint, ¶ 6.<br><br>Parish Answer to DLF Complaint, ¶ 8. |
| **Affirmative Defense: First Amendment** | |
| f.   The Parishes' property rights are protected by the First Amendment to the United States Constitution, thereby barring the relief requested in the Complaint. | ASF Answer to RE Trust Complaint, ¶ 9.<br><br>Parish Answer to RE Trust Complaint, ¶ 9.<br><br>ASF Answer to Unrecorded Interests Complaint, ¶ 9.<br><br>ASF Answer to DLF Complaint, ¶ 7.<br><br>Parish Answer to DLF Complaint, ¶ 9. |

## III.
## ARGUMENT

A.   **Legal Standard for Summary Judgment.**

Rule 7056 of the Federal Rules of Bankruptcy Procedure, incorporating Rule 56 of the

Federal Rules of Civil Procedure, provides that a party may move for summary judgment or

partial summary judgment. Rule 7056(a) provides: "A party may move for summary judgment, identifying each claim or defense – or the part of each claim or defense – on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

The evidentiary burdens on a motion for summary judgment are as follows:

> While the movant bears the burden of showing the absence of a genuine issue of material fact, the movant need not negate the non-movant's claim, but need only point to an absence of evidence to support the non-movant's claim. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S. Ct. 2548, 2553 (1986); *Universal Money Ctrs., Inc. v. AT&T,* 22 F.3d 1527, 1529 (10th Cir. 1994). If the movant carries this initial burden, the non-movant may not rest upon its pleadings, but must set forth specific facts showing a genuine issue for trial as to those dispositive matters for which it carries the burden of proof. *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 2514 (1986); *Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.,* 912 F.2d 1238, 1241 (10th Cir. 1990). An issue of material fact is genuine if a reasonable jury could return a verdict for the non-movant. *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510.

*Wolf v. Prudential Ins. Co. of Am.,* 50 F. 3d 793, 796 (10th Cir. 1995). Material facts are those relating to the substantive law of a cause of action. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment . . . ." *Id.* at 249.

Summary judgment should be granted if a trial on the issue would be "useless" because there are no genuine issues of fact relative to a claim or defense, and the issue can be determined as a matter of law. *Hunt v. Pick,* 240 F. 2d 782, 784-85 (10th Cir. 1957) ("[W]here multiple claims are made or multiple defenses are asserted the remedy is proper if no genuine issue of fact

exists relative to any one claim or defense that is determinative of part or all of the issues. The existence of disputed facts on other issues does not defeat the proper application of summary disposition to those issues where no such dispute exists.") (summary judgment based on laches affirmed).

Summary judgment is appropriate to pierce the allegations contained in the pleadings to dispose of an affirmative defense or part thereof. Rule 7056 refers to summary judgment based on identification of a "claim or defense – or the part of each claim or defense – on which summary judgment is sought." Fed. R. Civ. P. 7056(a). *See Boyko v. Parker,* 960 F. Supp. 2d 1270, 1271 (D. Utah 2013) (partial summary judgment may be used to dispose of affirmative defenses; citations omitted); *In re Farmers Ins. Co.,* 738 F. Supp. 2d 1180, 1232-33 (W.D. Okla. 2010) (same; partial summary judgment as to affirmative defense granted in favor of plaintiff).

## B.    <u>Summary Judgment Is Mandated on the RFRA Affirmative Defense.</u>

The Defendants' RFRA defense fails as a matter of law for at least three reasons. First, RFRA does not create a defense against the Committee, which is private non-government actor. Second, RFRA may not be applied to modify, preempt, or trump state law. Third, RFRA does not modify or limit the provisions of the Bankruptcy Code because it, and its provisions for the recovery of fraudulent transfers, does not burden the Defendants' exercise of religion and the provisions serve a compelling government interest.

### 1.    RFRA Does Not Create a Cause of Action or Defense Against Non-Government Actors.

RFRA, 42 U.S.C. § 2000bb *et seq*., only creates a cause of action or defense against "a government," and the Committee is a private party.

### a. The plain language of RFRA only permits a defense against "a government."

The interpretation of any statute begins with the text. *Conrad v. Phone Directories Co.,* 585 F. 3d 1376, 1381 (10th Cir. 2009); *In re Lobera*, 454 B.R. 824, 836-37 (Bankr. D.N.M. 2011). RFRA provides:

> (a)    In General. ***Government*** shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability, except as provided in subsection (b) of this section.

> (b)    Exception. ***Government*** may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest.

> (c)    Judicial relief. A person whose religious exercise has been burdened in violation of this section may assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief ***against a government***. Standing to assert a claim or defense under this section shall be governed by the general rules of standing under article III of the Constitution.

42 U.S.C. § 2000bb-1 (emphasis supplied).

RFRA defines "government" to include "a branch, department, agency, instrumentality, and official (or other person acting under color of law) of the United States." 42 U.S.C. § 2000bb-2(1). RFRA "applies to all Federal law, and the implementation of that law." 42 U.S.C. § 2000bb-3. RFRA's "Judicial relief" section provides that "[a] person may assert a violation of this chapter as a claim or defense in a judicial proceeding and obtain appropriate relief against a government." 42 U.S.C. § 2000cc-2.

15DOCS_SF:105147.4 05066/002

The Sixth, Seventh, and Ninth Circuit Courts of Appeal have concluded that this language makes clear that Congress intended RFRA to apply only in cases where the "government" is a party. *Gen. Conference Corp. of Seventh-Day Adventists v. McGill,* 617 F.3d 402, 411-12 (6th Cir. 2010); *Listecki v. Official Comm. of Unsecured Creditors*, 780 F.3d 731, 737 (7th Cir. 2015); *Sutton v. Providence St. Joseph Med. Ctr.,* 192 F.3d 826, 834 (9th Cir. 1999). *See also Mathis v. Christian Heating & Air Conditioning, Inc.,* 158 F. Supp. 3d 317*,* 325-27 (E.D. Pa. 2016) (summary judgment striking RFRA as affirmative defense in suit between private parties); *Van Stry v. McCrea,* 2020 U.S. Dist. LEXIS 62338 at *17-21 (E.D. Tex. Apr. 9, 2020) (same).

These decisions emphasize that the statute prohibits the ***"government"*** from substantially burdening the free exercise of religion except when that burden is justified by a "compelling governmental interest." 42 U.S.C. § 2000bb-1 (emphasis added); *McGill*, 617 F.3d at 411. The statute provides relief ***"against a government"*** to parties asserting RFRA as a claim or defense. 42 U.S.C. § 2000cc-2 (emphasis added); *Listecki,* 780 F.3d at 737 ("If the government is not a party, no one can provide the appropriate relief."). In addition, Congress emphasized the importance of the government's presence in the findings and purposes section of RFRA. Specifically, Congress found that "governments should not substantially burden religious exercise without compelling justification" and the statute provides that one of its purposes is to "provide a claim or defense to persons whose religious exercise is substantially burdened by government." 42 U.S.C. § 2000bb(b)(2); *McGill,* 617 F.3d at 411.

Furthermore, the burden-shifting framework set forth in RFRA requires the government to "demonstrate[]" that its action is in furtherance of a compelling government interest and that it is the least restrictive means of furthering that compelling government interest. 42 U.S.C. § 2000bb-1(b). RFRA defines "demonstrates" as "meet[ing] the burdens of going forward with the evidence and of persuasion." 42 U.S.C. § 2000bb-2(3). "It is self-evident that the government cannot meet its burden" under this framework "if it is not a party to the suit." *Listecki,* 780 F.3d at 736. "A private party cannot step into the shoes of the 'government' and demonstrate a compelling governmental interest and that it is the least restrictive means of furthering that compelling governmental interest because the statute explicitly says that the 'government' must make this showing." *Id*; *see also Rweyemamu v. Cote*, 520 F.3d 198, 203 n.2 (2d Cir. 2008) ("Where, as here, the government is not a party, it cannot 'go[] forward' with any evidence." (quoting *Hankins v. Lyght,* 441 F.3d 96, 114-15 (2d Cir. 2006) (Sotomayor, J. dissenting)).

Defendants have previously, and incorrectly, suggested that there is a split of authority on the issue of whether RFRA only applies where the government is a party, relying on *Hankins v. Lyght,* 441 F.3d 96, 114-14 (2d Cir. 2006); *EEOC v. Catholic Univ. of Am.,* 83 F.3d 455, 470 (D.C. Cir. 1996); and *Christians v. Crystal Evangelical Free Church (In re Young)*, 82 F.3d 1407, 1420 (8th Cir. 1996), *vacated*, 521 U.S. 1114 (1997), *reinstated by* 141 F. 3d 854 (8th Cir. 1998), *cert denied*, 525 U.S. 811 (1998). Parish Opposition to Standing Motion [Bankr. Docket No. 416] at pp. 16-17, notes 73-75.

Any reliance on the Second Circuit's interpretation of RFRA in *Hankins,* 441 F.3d at 103-04 is misplaced. First, *Hankins* is distinguishable. It involved a suit brought under the Age

Discrimination in Employment Act (ADEA) in which the Second Circuit permitted a private defendant to assert a RFRA defense because, hypothetically, the government, through the EEOC, could have been a party to the action. *Id.* at 103. The logic of *Hankins* is suspect. *Hankins* relies on the assumption that "the substance of the ADEA's prohibitions cannot change depending on whether it is enforced by the EEOC or an aggrieved private party." *Id.* at 103. There is no authority for such an assumption. Indeed, as then-Judge Sotomayor explained in her dissent, "[i]f RFRA amends all federal statutes as they apply to suits in which the government is a party, then the substance of [a statute's] prohibitions most certainly *can* change depending on who enforces it." *Id.* at 115 (Sotomayor, J., dissenting) (emphasis in original). Critically, the Second Circuit has since retreated from the holding in *Hankins* because it could "not understand how" RFRA "can apply to a suit between private parties, regardless of whether the government is capable of enforcing the statute at issue." *Rweyemamu*, 520 F.3d at 203 n.2.

Another case cited by Defendants, *EEOC v. Catholic Univ. of Am.,* 83 F.3d at 467-70, is also inapposite as the government was a party and the decision did not even consider the issue of whether RFRA only applies in suits where the government is a party. Similarly, *Young,* is discussed and distinguished in detail *infra* at pages 26-29. Again, *Young* does not even address the issue of whether RFRA applies where the government is not a party.

If the statutory test was not clear and persuasive enough, the legislative history of RFRA confirms that the government must be a party in order for the statute to apply. *See Bd. of Cty. Commissioners v. Suncor Energy (USA) Inc.,* 965 F. 3d 792, 804 (10th Cir. 2020) ("If statutory meaning cannot be derived merely by reference to the text, we may also look to traditional

canons of statutory construction to inform our interpretation, and may seek guidance from Congress's intent, a task aided by reviewing the legislative history;" internal quotations and citations omitted). The Senate Committee on the Judiciary issued a report on RFRA that "began by stating that the nation was founded by those with a conviction that they should be free to practice their religion 'free from Government interference' and 'Government actions . . . ' In describing RFRA's purpose, the report refers to 'government actions,' 'only governmental actions,' and 'every government action.'" *Listecki,* 780 F.3d at 737 (quoting S. Rep. No. 103-111, at 4, 8-9 (1993)).

The plain language of RFRA, its legislative history, and cases including *Listecki* confirm that the statute only provides a defense, if at all, to actions in which the government is a party. The Committee is a private party acting on behalf of unsecured creditors, and the government is not a party to this action. *See* Undisputed Facts at Section II, *supra* (hereafter, "UF Nos.") 5-8 (Committee appointment and Complaints). As a matter of law, RFRA is not an applicable defense to any claim asserted by the Committee.

### b. The Committee is not a government under RFRA.

The Committee is not a "government" under any conceivable interpretation of the statute's definition.

Pursuant to RFRA, 42 U.S.C. section 2000bb-2(1), "the term 'government' includes a branch, department, agency, instrumentality, and official (or other person acting under color of law) of the United States, or of a covered entity." The Committee is not a branch, department,

agency or instrumentality of the United States. Nor is it an official or other person acting under color of law of the United States.

The Bankruptcy Code also treats creditors' committees as private, non-governmental actors. For example, a creditors' committee is not included in the Bankruptcy Code's definition of "governmental unit," which provides:

> The term "governmental unit" means United States; State; Commonwealth; District; Territory; municipality; foreign state; department, agency, or instrumentality of the United States (but not a United States trustee while serving as a trustee in a case under this title), a State, a Commonwealth, a District, a Territory, a municipality, or a foreign state; or other foreign or domestic government.

Bankr. Code § 101(27).[9]

In this case, the Committee represents its creditor-constituents' private interests and seeks to maximize the value of ASF's estate to advance those private non-governmental interests. RFRA does not apply to, or bar, the Committee's complaints because, as a matter of law, the Committee is not a government, or government actor, and does not represent the interests of the government.

      **c. The Committee is not a government actor under RFRA because it is neither acting "under color of law" nor "willfully participating in joint action with government officials."**

The Parishes have suggested in their opposition to the Standing Motion that the Committee acts "under color of law" and therefore is the "government" by virtue of its powers

---

[9] The Bankruptcy Code's treatment of a creditors' committee as a nongovernmental entity is underscored by the fact that only "persons" are eligible to serve on a creditors' committee and the Bankruptcy Code's definition of "person" specifically excludes "governmental units," with a narrow exception that permits only certain government creditors to serve on committees. *See* Bankr. Code § 101(45). No governmental units are members of the Committee. *See Notice of Appointment of Committee of Unsecured Creditors* [Bankr. Docket No. 53].

under the Bankruptcy Code and appointment by the United States Trustee.  Parish Opposition to Standing Motion at p. 18.  The Seventh Circuit's decision in *Listecki* is the only decision to consider whether a creditors' committee is the "government" for RFRA purposes.  *Listecki* held unequivocally that it is not.

The phrase "color of law of the United States" in RFRA mirrors that found in 42 U.S.C. § 1983, which applies civil rights liability to those acting "under color of" any statute, ordinance, regulation, custom, or usage.  Circuit courts uniformly conclude that this word choice is not coincidental and have held that Congress intended for RFRA's "color of law" analysis to overlap with section 1983 analysis.  *Tanvir v. Tanzin,* 894 F.3d 449, 462 (2d Cir. 2018); *Listecki,* 780 F.3d at 738; *Sutton*, 192 F.3d at 834-35 (all  interpreting RFRA "acting under color of law" in the same way as section 1983 because "[w]hen a legislature borrows an already judicially interpreted phrase from an old statute to use it in a new statute, it is presumed that the legislature intends to adopt not merely the old phrase but the judicial construction of the phrase" (internal citation omitted); *see also Brownson v. Bogenschultz,* 966 F. Supp. 795, 797 (E.D. Wis. 1997) (same).  Therefore, it is appropriate for this Court to turn to section 1983 precedent.

In the Tenth Circuit, for conduct to be "fairly attributable to the state" when private parties are involved in a section 1983 action, two conditions must be met.  "First, the 'deprivation must be caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the State or by a person for whom the state is responsible.' Second, the private party must have 'acted together with or . . . obtained significant aid from state officials or engaged in conduct otherwise attributable to the State.'"  *Pino v. Higgs*, 75 F.3d

1461, 1465 (10th Cir.1996) (quoting *Wyatt v. Cole* , 504 U.S. 158, 162 (1992)); *see also*,

*Gallagher v. Neil Young Freedom Concert*, 49 F.3d 1442 (10th Cir. 1995) (delineating four tests

the Supreme Court has used to determine whether private parties should be deemed state actors

when conducting a state action analysis: (1) the public function test, (2) the nexus test, (3) the

symbiotic relationship test, and (4) the joint action test).  But "[a]t its most basic level, the state

action doctrine requires that a court find such a close nexus between the State and the challenged

action that the challenged action… that the action… may be fairly treated as that of the State

itself.'" *Jackson v. Metro Edison Co*., 419 U.S. 345, 351 (1974).  In *Listecki,* the Seventh Circuit

based its holding that the committee was not acting under color of law on the same tests.

*Listecki,* 780 F. 3d at 738.

     In *Listecki,* the Seventh Circuit explained at length why a creditors' committee cannot be

considered to be acting under color of law.  *Id.* at 738-39.  A committee typically consists of

private, individual creditors, whose actions are supervised by the court, but its actions are not

those of the government or of the court.  *Id.  Listecki* explains:

> [O]nce a committee is created, it takes on a life of its own.  The
> committee can, with the court's approval, employ one or more attorneys,
> accountants, or other agents to represent or perform services for the
> committee.  11 U.S.C. § 1103(a).  Here, the Committee has retained
> counsel that represents them in this appeal.  Those professionals report to
> the committee, not the Trustee or the court.  The committee has an
> attorney-client relationship with the attorney.  Neither the Trustee nor the
> court is involved.  All of a committee's expenses, and the fees and
> expenses of the professionals that the committee hires, are paid for by the
> Estate and not the government.  The Trustee can weigh in, and the court
> has input, but the money ultimately comes from the Estate, rather than the
> public coffers.

          \* \* \*

22

> Perhaps most problematic for the Archdiocese's argument is
> that a committee represents the larger interests of the unsecured
> private creditors, and it is to them, and not the Trustee, court, or any
> governmental actor, that the committee owes a fiduciary duty. *Smart
> World Techs., LLC v. Juno Online Services,* 423 F.3d 166, 175 n.12 (2d
> Cir. 2005) ("[C]reditors' committee owes a fiduciary duty to the class it
> represents, but not to the debtor, other classes of creditors, or the estate.");
> *In re SPM Mfg. Corp.*, 984 F.2d 1305, 1315-16 (1st Cir. 1993) (same).
> The committee does not have to act in accordance with the Trustee's or
> court's wishes. In fact, the committee can, and should, oppose the Trustee
> if it is acting against the best interests of the unsecured creditors. *See In re
> Bayou Group*, LLC, 564 F.3d 541, 547 (2d Cir. 2009) (noting both the
> creditors' committee and bankruptcy court disagreed with Trustee's
> motion to appoint trustee); *In re Columbia Gas Sys., Inc.*, 33 F.3d 294,
> 295 (3d Cir. 1994) (noting difference between the committee's and
> Trustee's position on interpretation of statute). **It is beholden to no
> governmental actor.**

*Listecki,* 780 F.3d at 738-739 (emphasis added). A committee acts on behalf of the members of

its constituent class and has a fiduciary duty to protect the interests of that class, not the debtor,

the U.S. Trustee, or any government actor.

The Adversary Proceedings are not actions by the government, or by a private actor

acting under color of federal law or jointly with the government. *See* UF Nos. 6-8. To allow the

Defendants to insulate themselves from claims by the Committee on behalf of the estate would

require the Court to create a defense under RFRA which is not provided for in the statute, and

which is the sole province of Congress.

### 2. RFRA May Not Be Applied to Modify or Preempt State Law.

RFRA cannot be applied to modify or preempt state law in order to preclude the

Committee's claims. In *City of Boerne v. Flores,* 521 U.S. 507 (1997), the Supreme Court held

that RFRA, as applied to state law, was a violation of (1) the inherent limitations of federalism

(*id.* at 534), (2) the separation of powers (*id.* at 536), and (3) the procedures for constitutional

amendment in Article V of the Constitution (*id.* at 529).  At a bare minimum, RFRA is beyond

Congress's power to regulate the states and any attempt to modify, preempt, or trump state law

through RFRA is unconstitutional.

At issue in the RE Trust and DLF Trust Complaints is what constitutes property of ASF's

estate.  While Bankruptcy Code section 541 defines what property of the debtor becomes part of

the bankruptcy estate, the nature and extent of the debtor's interest in that property is governed

by state law.  *See Butner v. United States,* 440 U.S. 48, 55 (1979).  In order to determine whether

ASF made avoidable transfers of estate assets to the Trusts, the Court must determine whether

the assets were held in one or more resulting equitable trusts under New Mexico state law prior

to the time that such assets were transferred to the formal Trusts as alleged by the Defendants.

Also at issue in the RE Trust and DLF Trust Complaints is whether the assets of the Trusts are

available to the estate's creditors pursuant to New Mexico Statute 46A-5-505 and 505A(1)

because the Trusts are self-settled and ASF is a beneficiary, and whether ASF's fiduciary duties

to its creditors under New Mexico law require it to revoke the RE Trust and DLF Trust  pursuant

to New Mexico Statute 46A-6-603.  *See* UF No. 6 (RE Trust Complaint, Eighth through

Eleventh Claims for Relief) and UF No. 8 (DLF Trust Complaint, Eighth through Eleventh

Claims for Relief).

Nor can RFRA apply to preclude a determination of what constitutes property of the

estate under section 541, which is governed by state law.  *Tort Claimants v. Roman Catholic*

*Archbishop of Portland*, 335 B.R. 842, 860 (Bankr. D. Or. 2005) ("Portland").  In *Portland,* the

court questioned how RFRA could apply to determining what constitutes property of the estate

even though the issue had not been raised by the committee. The *Portland* court held that even if RFRA did apply, section 541 does not impose a substantial burden on the free exercise of religion because it merely makes all interests in property of the debtor at the commencement of the case property of the estate. *Id.* Because these property interests are determined by state law, to which RFRA does not apply, section 541 cannot constitute a substantial burden.

The estate's fraudulent transfer claims in the RE Trust and DLF Trust Complaints are asserted under New Mexico state law as permitted by Bankruptcy Code section 544(b).[10] *See* UF No. 6 (RE Trust Complaint, First through Sixth Claims for Relief), UF No. 8 (DLF Trust Complaint, First through Sixth Claims for Relief). While a federal law (*i.e.*, Bankruptcy Code section 544(b)) enables the debtor (and here, the Committee) to stand in the shoes of a creditor who can assert a fraudulent conveyance action under state law, the underlying cause of action for the avoidance of the fraudulent transfer itself is brought under state law. *Boerne* prohibits the application of RFRA to fraudulent transfer claims under state law. The Parishes/Trusts, as transferees, suffer the same burden under New Mexico fraudulent transfer law whether or not the claims are enabled by section 544(b) because outside of bankruptcy any creditor of ASF could sue the Parishes and Trusts to avoid the transfers from ASF under New Mexico fraudulent transfer law, unimpeded by RFRA.

By their RFRA defense, the Parishes and Trusts seek to immunize themselves from fraudulent transfer liability because ASF elected to file a chapter 11 petition. To permit this

---

[10] Bankruptcy Code section 544(b) provides, "(1) Except as provided in paragraph (2), the trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable only under section 502 (e) of this title."

25DOCS_SF:105147.4 05066/002

would contravene the clear purpose of the Bankruptcy Code and section 544, which is to expand the estate's rights to recover transfers by a debtor, not contract them.[11]  State law cannot be modified or limited by RFRA.  As a matter of law, Defendants' RFRA defense fails and summary judgment on this defense should be granted.

### 3.     *In re Young* **is Distinguishable.**

In their opposition to the Standing Motion, the central authority relied upon by the Defendants to support their argument that RFRA constitutes a defense to the Adversary Proceedings is the Eighth Circuit's decision in *Christians v. Crystal Evangelical Free Church (In re Young)*, 141 F.3d 854 (8th Cir. 1998), *cert denied*, 525 U.S. 811 (1998).  Parish Opposition to Standing Motion at pp. 16-17, notes 73-75.

In *Young,* the Eighth Circuit held that RFRA was constitutional as applied to federal bankruptcy law in response to *Boerne,* and that the avoidance of tithes violated RFRA by substantially burdening the debtor's free exercise of religion and was not supported by compelling government interests.  *Id.* at 856-58.  Although the court found that RFRA "effectively amended the Bankruptcy Code" and "engrafted the additional clause to section 548 (a)(2)(A) that a recovery that places a substantial burden on a debtor's free exercise will not be allowed unless it is the least restrictive means to satisfy a compelling governmental interest" (*id.* at 861), it did not address the definition of government and who may bring actions because the

---

[11] *See Comm. of Tort Litigants v. Catholic Diocese of Spokane (In re Catholic Diocese of Spokane)*, 329 B.R. 304, 324 n.5 (Bankr. E.D. Wash. 2005)  ("If application of a particular Code section would constitute a substantial burden on religion, the appropriate remedy would be dismissal of the bankruptcy case.  The Code is an integrated statutory scheme.  Bankruptcy debtors who voluntarily choose to participate in that statutory scheme, even those of a religious nature, should not be able to pick and choose among Code sections."), *rev'd in part on other grounds*, 364 B.R. 81 (E.D. Wash. 2006).

issue was not raised by the parities. The case underscored the Supreme Court's holding that RFRA does not apply to state law claims. Even to the extent that *Young* applied RFRA to federal avoidance claims, the case is distinguishable on several grounds and has been rejected by the courts within the Tenth Circuit.

First, the Committee is suing under state law pursuant to section 544 so, as discussed above, under *Boerne*, RFRA is inapplicable to claims asserted in the RE Trust and DLF Trust Complaints. No court has ever held that RFRA apples to avoidance actions brought in bankruptcy pursuant to state law. Second, *Young* was decided prior to Congress's subsequent amendment to the Bankruptcy Code under the Religious Liberty and Charitable Donation Protection Act of 1998 ("RLCDPA"), which amended numerous Bankruptcy Code sections to limit the ability of a trustee to recover charitable donations made by a natural person to qualified charitable or religious organizations. *See* Bankr. Code §§ 548(a)(2), 548(d)(3), 544(b)(2).[12] If Congress had intended RFRA to amend section 548 or any other section of the Bankruptcy Code, as the *Young* court claimed, RLCDPA would not have been necessary. Third, tithing cases are easily distinguished from the avoidance issues raised by the Adversary Proceedings. Tithing is done regularly, repeatedly, and for a clear religious purpose and, while there are limitations on avoidable transfers, an individual debtor is not exempted from the application of section 548 to all manner of tithing.

---

[12] Congress passed the RLCDPA, Pub. L. No. 105-183 §§ 2, 3(a), June 19, 1998, 112 Stat. 517, amending Bankruptcy Code section 548 to expressly shield "a charitable contribution to a qualified religious or charitable entity" from avoidance, provided that "the amount of that contribution does not exceed 15 percent of the gross annual income of the debtor for the year in which the transfer of the contribution is made" or "was consistent with the practices of the debtor in making charitable contributions." Bankr. Code § 548(a)(2).

27DOCS_SF:105147.4 05066/002

Here, ASF made massive asset transfers of most of its real and personal property, divorced from any religious purpose, as part of a one-time, out-of-the-ordinary asset protection scheme, in the face of enormous potential liability for enabling the clergy's sexual abuse of children. ASF could have avoided fraudulent transfer liability by incorporating its Parishes under civil law decades ago and requiring them to hold title to the real and personal property, or if ASF insisted on holding legal title, doing so pursuant to an express written trust agreement under state law. This is also true with respect to real property that is the subject of avoidance claims under Bankruptcy Code section 544(a)(3) in the Unrecorded Interests Complaint.

Courts within the Tenth Circuit have considered and rejected Defendants' argument that RFRA constitutes a defense to fraudulent transfer claims. *Weinman v. Word of Life Christian Ctr. (In re Bloch)*, 207 B.R. 944, 950-51 (D. Colo. 1997) (summary judgment granted to avoid tithing transfers under 544, 548, and 550; trustee's recovery imposes only minimal burden on exercise of religion, not substantial so as to shift legal burden); *Morris v. Midway S. Baptist Church (In re Newman)*, 183 B.R. 239 (Bankr. D. Kan. 1995), *aff'd* at 203 B.R. 468, 476-78 (D. Kan. 1996) (section 548 does not impose a substantial burden on religion and even if it did, the interests furthered by section 548 are compelling; recovery of tithes as fraudulent transfers does not violate First Amendment or RFRA). Since *Young,* the Tenth Circuit has held that RLCDPA permits avoidance and recovery of the entire transfer made to a religious entity to the extent that it exceeds the legislated threshold. *Wadsworth v. Word of Life Christian Ctr. (In re McGough),* 737 F. 3d 1268 (10th Cir. 2013).

The RFRA affirmative defense is subject to summary judgment in favor of the Committee, even if the Committee were a government actor or if RFRA were found to be applicable where the government is not a party, because the avoidance and recovery of transfers from ASF to the Parishes/Trusts for the benefit of the estate do not impose a substantial burden on the free exercise of religion. *In re McGough,* 737 F. 3d at 1277 n.8 (RFRA prohibits a government from substantially burdening the free exercise of religion, but 548(a)(2) does not prevent all tithing and merely allows recovery of large contributions that are inconsistent with past practices; section 548 "does not burden, let alone substantially burden, legitimate tithing"); *In re Newman,* 203 B.R. at 477 (no substantial burden because narrowly circumscribed fraudulent transfer provisions do not constrain conduct or belief). The Committee seeks to avoid extraordinary transfers that were made by ASF for the acknowledged purpose of asset protection (UF No. 3), not as an expression of religious faith comparable to tithing.

**4.    RFRA Does Not Bar the Committee's Claims Because the Bankruptcy Code and Its Provisions for Recovery of Fraudulent Transfers Serve a Compelling Government Interest.**

Even if RFRA were applicable to the Adversary Proceedings, it would not bar prosecution of claims under sections 541, 542, 544 and 548 of the Bankruptcy Code because the Code, and these provisions in particular, serve a compelling interest and provide the least restrictive means of advancing that interest.[13]  *Listecki* 780 F.3d 731, 746 (extensive discussion of the scope, nature, and Supreme Court precedent leading to the conclusion that the Bankruptcy Code advances a compelling governmental interest). *See also In re Newman*, *supra,* 183 B.R.

---

[13] Even when RFRA is applicable, the statute creates an exception where the challenged burden serves a compelling government interest and is the least restrictive means of furthering that interest. 42 U.S.C. § 2000bb-1(b).

239, 252 (Bankr. D. Kan. 1995) ("The compelling nature of the interest is reflected in the fact that recovery of fraudulent transfers has been a basic tenet of bankruptcy law for 400 years."), *aff'd*, 203 B.R. 468 (D. Kan. 1996).  They are also the least restrictive means to serve the fairness interests at the heart of the fraudulent conveyance provisions.  *In re Newman,* 203. B.R. at 477-78 (fraudulent transfer statute satisfies least restrictive means requirement of RFRA).  As the *Newman* court noted:

> Section 548 (a)(2) draws a line between proper and improper diminution in what would seem to be the only practical way: by determining whether the quantifiable economic value received by the debtor is reasonably equivalent to that of the property transferred.  As stated above, this standard is neutral toward religion and can operate to avoid non-religious transfers where no economic value is received by the debtor.

*Id. at* 475, n.4.  *See also In re Meyer*, 467 B.R. 451, 460-61 (Bankr. E.D. Wis. 2012) ("Congress demonstrated a compelling interest in maintaining an equitable system for the protection of creditors and for permitting debtors to obtain a fresh start from overwhelming debt;" rejecting First Amendment challenge to denial of discharge); *In re Navarro*, 83 B.R. 348, 353 (Bankr. E.D. Pa. 1988) (pre-RFRA; administration of bankruptcy system and protection of legitimate interests of creditors are compelling governmental interests).

Even if RFRA were applicable to the Complaints (it is not), the Committee's claims do not violate RFRA because the challenged application of the Bankruptcy Code serves a compelling government interest and is the least restrictive means of doing so.

**C.** **The So-Called Church Autonomy Doctrine Defenses Fail as a Matter of Law.**

**1.** **The So-Called Church Autonomy Doctrine Only Applies to Intra-church Disputes That Require a Court to Determine Matters of Religious Doctrine or Belief.**

Defendants assert the so-called Church Autonomy Doctrine as affirmative defenses to each of the Complaints on the grounds that the claims for relief require "that the Court interfere with and disregard the Archdiocese's ecclesiastical structure and governance in violation of the First Amendment to the United States Constitution, which protects the rights of religious organizations to adhere to their own ecclesiastical governments, thereby barring the relief requested in the Complaint." UF No. 10 (b)-(e).[14] As this Court has already correctly concluded, the Complaints do not raise the kind of intra-church disputes that the Church Autonomy Doctrine protects from court interference. Opinion, 15. Moreover, the Supreme Court has never held that the Church Autonomy Doctrine shields a religious entity from liability to third parties based on generally applicable law.[15]

As revealed in their oppositions to the Standing Motion, Defendants contend that under canon law, parishes are separate "juridic" entities, and that notwithstanding the fact that ASF held legal title to its real and personal property when it was transferred to the Trusts, under canon law, the Parishes either owned the property or ASF held it in trust for them and therefore the transfers were not of property of the estate. Defendants argue that the Church Autonomy

---

[14] ASF alone asserts Religious Liberty Defenses to the Unrecorded Interests Complaint, including that the claims allegedly violate the Church Autonomy Doctrine.

[15] *See* Marci A. Hamilton, *Foundations of Church Autonomy: Article: Religious Institutions, the No-Harm Doctrine, and the Public Good, supra* n. 4, 2004 B.Y.U.L. Rev. at 1182-90 (Supreme Court does not use the phrase "church autonomy;" explaining how religious freedom cases underscore the absolute protection of beliefs while actions affecting third parties are governed by neutral principles of law).

Doctrine precludes this Court from applying the neutral and generally applicable provisions of the Bankruptcy Code and New Mexico law to resolve the disputes raised in the Complaints. Rather, Defendants contend, the Court must apply and presumably interpret canon law.

The Supreme Court has instructed that civil courts must decline to decide internal church controversies when to do so would require the court to implicate itself in doctrinal religious questions. Civil courts have no authority to resolve disputes over "matters of church government as well as those of faith and doctrine." *Kedroff v. Saint Nicholas Cathedral of Russian Orthodox Church*, 344 U.S. 94, 116 (1952). Examples of questions of doctrine and governance subject to ecclesiastical abstention include whether a denomination has departed from its previous theological commitments, *Presbyterian Church in U.S. v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church*, 393 U.S. 440, 442-443 (1969) ("Presbyterian Church"), which church officials are entitled to hold sacred offices, *Serbian E. Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 724 (1976), who is "transmitting the [religious] faith to the next generation," *Hosanna-Tabor Evangelical Church & Sch. v. EEOC,* 565 U.S. 171, 192 (2012), or who is "educating and forming students in the faith." *Our Lady of Guadalupe School v. Morrissey-Berru,* 140 S. Ct. 2049, 2069 (2020). To resolve such disputes, courts would necessarily pass judgment on questions of religious doctrine or governance. But courts have neither a legitimate interest in regulating such issues nor the competence to decide them. *Milivojevich,* 426 U.S. at 714 n.8 (citing *Watson v. Jones, infra*).

The seminal case relied upon by Defendants in opposing the Standing Motion based on church autonomy[16] makes clear that a court should abstain only from determining internal church disputes that require it to determine matters of religious doctrine or ecclesiastical government:

> **In this country the full and free right to entertain any religious belief, to practice any religious principle, and to teach any religious doctrine which does not violate the laws of morality and property, and which does not infringe personal rights, is conceded to all.** The law knows no heresy, and is committed to the support of no dogma, the establishment of no sect. The right to organize voluntary, religious associations to assist in the expression and dissemination of any religious doctrine, and to create tribunals for the decision of controverted questions of faith within the association, and for the ecclesiastical government of all the individual members, congregations, and officers within the general association, is unquestioned. **All who unite themselves to such a body do so with an implied consent to this government, and are bound to submit to it.**

*Watson v. Jones,* 80 U.S. 679, 728-29 (1872) (emphasis added). By contrast, where the dispute does not involve ecclesiastic questions, "[the church]'s decision would be utterly disregarded by any civil court." *Id.* at 733.

The Supreme Court cases in which the Court abstained from determining ecclesiastical issues based on so-called church autonomy where property rights were at stake, were, in fact, intra-organizational disputes involving conflicts between two or more church factions. Both *Watson v. Jones,* 80 U.S. 679, and *Presbyterian Church,* 393 U.S. 440, involved disputes over religious doctrine in which one faction of the Presbyterian church, embracing doctrinal views that differed from the traditional views, sought recognition as the "true" church, as well as control of church property. In *Watson,* two factions within the church differed over the issue of slavery in relation to church teachings; in *Presbyterian Church,* the controversy revolved around

---

[16] Debtor's Opposition to Standing Motion, [Dkt. 418] at 34-35.

the decision to ordain women and to take positions on social issues of the day. *Milivojevich,* 426 U.S. 696, involved a dispute between the Serbian Mother Church and its North American diocese over the removal of a U.S. bishop and the reorganization of the diocese into three separate dioceses. The diocese claimed that the bishop's removal and the diocesan reorganization were both improper under binding church rules, and the Illinois Supreme Court ultimately agreed, ordering the bishop's reinstatement and invalidating the reorganization. The U.S. Supreme Court reversed, holding that the state court violated the First Amendment based on its "impermissible rejection of the decisions of the highest ecclesiastical tribunals of this hierarchical church ... and [by] impermissibly substituting its own inquiry into church polity and resolutions based thereon" in place of the church hierarchy's determinations. *Id.* at 708. Using jurisdictional language, the Supreme Court emphasized that secular courts have no authority to override an ecclesiastic decision by church authorities. *Id.* at 713-15. *See also Kedroff, supra,* 344 U.S. 94 (state statute changing who within a church controlled a cathedral unconstitutional); *Kreshik v. Saint Nicholas Cathedral of Russian Orthodox Church*, 363 U.S. 190, 191 (1960) (same regarding judicial review applied to use and occupancy of cathedral).

In light of these Supreme Court decisions, the Tenth Circuit stated the obvious: "The church autonomy doctrine . . . does not apply to purely secular decisions, even when made by churches. ***Before the church autonomy doctrine is implicated, a threshold inquiry is whether the alleged misconduct is 'rooted in religious belief.'"*** *Bryce v. Episcopal Church in the Diocese of Colorado*, *supra,* 289 F.3d 648, 657 (employment discrimination suit dismissed based on ministerial exception) (emphasis added).

Supreme Court precedent makes clear that the Church Autonomy Doctrine cannot be applied to the claims asserted in the Complaints, which only raise disputes between *secular* and religious entities and do not require the Court to determine questions of religious doctrine or church government. *Gen. Council on Fin. & Admin. v. Cal. Superior Court,* 439 U.S. 1369, 1372-73 (1978) ("[T]his Court never has suggested that those [intrachurch] constraints similarly apply outside the context of such intraorganization disputes. . . . Such considerations are not applicable to purely secular disputes between third parties and a particular defendant, albeit a religious affiliated organization, in which fraud, breach of contract, and statutory violations are alleged."); *Cantwell v. Conn.,* 310 U.S. at 306 ("Nothing we have said is intended even remotely to imply that, under the cloak of religion, persons may, with impunity, commit frauds upon the public."); *Employment Div. Dept. of Human Resources of Ore. v. Smith* ("Smith")*,* 494 U.S. 872, 885 (1990) (To make compliance with a neutral law contingent upon coincidence with religious beliefs would permit each individual "to become a law unto himself.")(citing *Reynolds v. U.S.*, 98 U.S. 145 (1879)); *McDaniel v. Paty,* 435 U.S. 618, 643 n.* (1978) (Stewart, J., concurring) ("[A]cts harmful to society should not be immune from proscription simply because the actor claims to be religiously inspired."); *Gonzalez v. Roman Catholic Archbishop,* 280 U.S. 1, 16, (1929) (noting fraud exception to intrachurch religious autonomy doctrine).

As the Seventh Circuit observed in *Listecki,* 780 F. 3d at 742 (holding that RFRA and First Amendment do not bar fraudulent transfer claims against religious entity), "Here, we have what was alleged to be a fraudulent or otherwise avoidable transfer, and the court need not interpret any religious law or principles to make that determination, nor must it examine a

decision of a religious organization or "tribunal" on whether or not the transfer was fraudulent."

The *Listecki* court continued, "We do not believe that there is, nor can there be, a religious

exception that would allow a fraudulent conveyance in the name of free exercise." *Id.* at 749.

*See also Portland*, 335 B.R. at 851 (rejecting church autonomy defense on issue of separate

existence of unincorporated parishes, holding that restriction on the court's jurisdiction "does not

mean that it may never adjudicate matters involving church property").

> 2.     **Application and Interpretation of Canon Law to Determine the Status of Estate Property Would Impermissibly Entangle the Court in Religious Doctrine.**

The application of the Church Autonomy Doctrine would impermissibly entangle the

Court in religious questions by requiring it to apply, and then interpret, canon law, rather than the

neutral and generally applicable provisions of the Bankruptcy Code, New Mexico law, and the

underlying purported trust documents and deeds, to determine (i) whether unincorporated

parishes have a legal existence separate from ASF and can own property or be trust beneficiaries;

and (ii) property of the estate.

The Supreme Court has explained that civil courts must avoid this type of entanglement

in religious questions. *Jones v. Wolf,* 443 U.S. 595, 603 (1979) involved a property dispute

between two rival factions of a church. The Supreme Court held that civil courts deciding

intrachurch property disputes need not follow the determinations of the highest denominational

authority, explaining that First Amendment values are better served if courts apply "neutral

principals of law" by resolving intrachurch property disputes on the basis of "objective, well-

established concepts of trust and property law familiar to lawyers and judges." *Id.* at 603.  This

approach "free[s] civil courts completely from entanglement in questions of religious doctrine, polity, and practice." *Id.* A court "may adopt any one of various approaches for settling church property disputes so long as it involves no consideration of doctrinal matters, whether the ritual and liturgy of worship or the tenets of faith," and is "constitutionally entitled to adopt neutral principles of law as a means of adjudicating a church property dispute." *Id.* at 602, 604. *See also Mitchell v. Helms,* 530 U.S. 793, 828 (2000) (plurality op.) ("It is well established, in numerous other contexts, that courts should refrain from trolling through a person's or institutions religious beliefs."); *Watson v. Jones*, 80 U.S. at 729 (rejecting "appeal to the secular courts" for resolution of "any religious doctrine").

Courts within the Tenth Circuit have repeatedly stated that property disputes involving a religious organization should be resolved by application of neutral principles of law to the extent possible. Relying on *Jones v. Wolf,* the New Mexico District Court recently stated:

> **[I]f a dispute involving a religious organization can be resolved by application of neutral principles of law**, and does not require the court to become entangled in questions of religious doctrine, polity, and practice, **the First Amendment—and by extension, the church autonomy doctrine—does not bar the litigation.**

*Hubbard v. J Message Grp. Corp.*, 325 F. Supp. 3d 1198, 1213 (D.N.M. 2018) (emphasis added; alleged defamatory statements by religious group required impermissible intrusion into doctrinal beliefs). Likewise, relying on *Jones v. Wolf,* the Colorado District Court observed "[c]ourts may, however, decide property disputes involving religious institutions if they can be resolved under 'neutral principles of law.'" *Houston v. Mile High Adventist Acad.,* 846 F. Supp. 1449, 1455 (D. Colo. 1994) (same; claims regarding substandard biblical education). Again relying on *Jones v.*

*Wolf,* the Kansas Bankruptcy Court held that a bankruptcy estate may avoid tithes as fraudulent

transfers:

> This is essentially a dispute between competing claimants, one of which is a church, to property transferred from an insolvent debtor. The resolution of the dispute clearly does not involve the court in "questions of religious doctrine, polity, and practice." *See Jones v. Wolf*, 443 U.S. 595, 603, 61 L. Ed. 2d 775, 99 S. Ct. 3020 (1979). Rather, it depends upon the "neutral principles of law" found in the Bankruptcy Code. *Cf. id.* As such, it does not violate the First Amendment's restriction against civil courts becoming entangled in religious questions.

*In re Newman*, *supra,* 203 B.R. 468, 475 (recovery of transfers affirmed).

In their oppositions to the Standing Motion, Defendants attempted to justify their

argument that the Court was obligated to defer to canon law under the Church Autonomy

Doctrine by conflating the deference courts have invoked to protect church autonomy in ***other***

***types*** of disputes such as disputes over religious doctrine, employment, or ecclesiastical office.

Defendants apparently hope the Court will simply ignore the critical differences in these types of

disputes from the disputes raised by the Complaints.

Here, the Complaints seek the Court's resolution of claims by a secular entity

representing secular third party creditors against a religious entity. These disputes turn on the

Defendants' actions, not their religious beliefs. To adjudicate these disputes the Court will not

be required to resolve matters of religious doctrine, ecclesiastical office, employment of

ministers, or property disputes between church factions.

Critically, the Court cannot "abstain" or otherwise avoid resolving the disputes raised by

the Adversary Proceedings which the application of the Church Autonomy Doctrine would

require. As the Supreme Court noted in *Jones v. Wolf,* 443 U.S. at 602, the government is

obligated to provide for "the peaceful resolution of property disputes," and it has a duty to "provid[e] a civil forum" where the ownership of property "can be determined conclusively." *See Presbyterian Church,* 393 U.S. at 449 (similar). Because the Court must resolve the dispute over what constitutes property of the estate, the question is not whether it should decline to rule as in a typical Church Autonomy Doctrine case, but rather, whether it can apply and interpret neutral and generally applicable civil law in doing so. The only way for the Court to adhere to the First Amendment is to avoid entanglement with ecclesiastical law and apply civil law. *Jones v. Wolf* expressly held that it is constitutionally ***permissible*** to apply standard principals of trust, property and corporate law to resolve intrachurch property disputes. Where the dispute over property involves the rights of a secular entity, that approach is constitutionally ***required.***

As discussed in detail below, every court that has faced the issue has rejected the argument that the Church Autonomy Doctrine requires a court to defer to canon law in determining what constitutes property of the estate and the legal status of unincorporated parishes.

### 3. The Church Autonomy Doctrine Has Been Rejected by Every Court That Has Considered It in a Diocesan Bankruptcy Case.

The Defendants' contention that claims by secular entities against the Catholic Church must be adjudicated according to canon law has been rejected by every court that has considered it in diocesan bankruptcy cases. In *Portland, supra,* 335 B.R. 842, 849, the archdiocese was incorporated as a corporation sole under Oregon law and only one of the 124 parishes within the archdiocese had been separately incorporated as of the petition date. *Id.* The archbishop claimed that the bulk of the archdiocese's assets were held in trust for the benefit of the unincorporated

parishes and other juridic persons within the diocese, consistent with canon law. *Id.* at 848. The

*Portland* court specifically rejected the argument that it was required to consider and apply

internal church law in determining whether the parishes were legal entities separate from the

archdiocese:

> **The parties in this case seek a determination of whether particular property titled in the name of debtor belongs to debtor or belongs instead to parishes, schools, or others.** Whether or not such a determination allows or requires this court to consider the Roman Catholic Church's internal law, called the Code of Canon Law, it does not require resolution of a dispute over matters of church government, doctrine, or faith. **Who owns the property is, quite simply, not a theological or doctrinal matter.**
>
>             * * *
>
> As I explained above, however, neutral principles of law require application of secular neutral principles, not sacred ones. The religious organization's internal law is not relevant to the dispute, unless neutral principles of civil law make it so. **There is no constitutional requirement that internal church law be considered in determining a purely secular dispute.**

*Id.* at 853-54 (partial summary judgment granted that RFRA and First Amendment do not

preclude determination of estate property with respect to assets titled in the debtor; emphasis

added). The *Portland* court expressly rejected the argument "that, even if the parishes are not

legal entities that can hold title to real property, they have sufficient legal existence to allow

them to be beneficiaries of a trust."[17] In rejecting the debtor's argument that a judicial

determination that parish assets were property of the estate would substantially burden the free

---

[17] *Id*. at 867. ("Those statutes [tax code and state charitable trust code] do not provide support for concluding that parishes are sufficiently separate from debtor to be the beneficiaries of trusts. If anything, they show that, if an unincorporated religious organization is to have legal status for some purpose, a statute must expressly provide for such status.")

exercise of religion, the *Portland* court observed that civil law did not prevent the archdiocese

from holding property in a manner consistent with its internal organization. Enforcement of the

archdiocese's choice of how to organize its affairs with relation to the secular world, including

its choice of how to hold title to property, does not substantially burden the exercise of religion.

*Id.* at 853.

In *Portland*, as in this case, the archdiocese had a civil law solution to the problem it

created; namely, separate incorporation decades ago of each juridic person, instead of as part of a

massive asset protection scheme to put assets out of reach of sex abuse survivors. Canon law did

not excuse the need to follow the formalities of state property, corporate and trust law with

regard to how the property is held. *Id.* at 856. As the *Portland* bankruptcy judge observed:

> Debtor has chosen to organize its operations under a corporation sole. It chose to separately incorporate (or allow the separate incorporation of) [only one parish]; it could also have chosen to incorporate the other parishes as religious corporations, by which they would gain a civil legal status and could exercise the powers granted to such corporations, including the power to hold and dispose of property and to sue and be sued. Debtor did not, however, choose to do that, and gives no reason why it could not, under state law, have separately incorporated the parishes or in some other way organized itself to protect the canonical ownership rights, if any, of the schools and parishes.

*Id*. at 867.[18]

In the bankruptcy of the Diocese of Spokane, the bankruptcy court similarly rejected the

argument that it was bound to impose canon law upon third parties who deal with the diocese in

secular transactions. In particular, the court held civil law rather than canon law must be applied

---

[18] Conversely, when the parishes have been incorporated under state law, and hold legal title to real or personal property, absent substantive consolidation or application of the alter ego doctrine, their assets are not property of the estate. *In re Archdiocese of Milwaukee*, 483 B.R. 693, 699 (Bankr. E.D. Wis. 2012).

in determining whether the unincorporated parishes were separate legal entities and whether property titled to the diocese was actually owned by the parishes or held in trust for them. *In re Catholic Bishop of Spokane, supra* at n. 11, 329 B.R. 304, 325 ("Application of commonly understood and commonly applied statutes and common law regulating property interests, rather than application of ecclesiastical law, does not interfere with the free exercise of religion. Application of § 541 to this debtor on the same basis as its application to all other bankruptcy debtors does not interfere with the free exercise of religion.").

ASF's transfer of its assets to the Trusts was not "rooted in religious belief." *Bryce,* 289 F. 3d at 657. In fact, the disputed transfers, and the asset protection scheme of which they were a part, were completely divorced from religious belief. UF Nos. 1-3. Permitting the Church Autonomy Doctrine defenses to survive this summary judgment motion would condone a constitutional broadside by imposing ecclesiastical rules upon third parties who deal with ASF in secular transactions, or who are the victims of secular torts committed by ASF. Recognition of the Church Autonomy Doctrine under these circumstances would allow religious entities to fraudulently transfer assets with impunity. The Complaints do not implicate an internal church dispute among church factions or between a church and its current or former members over matters of religious doctrine or church government. *Portland, Spokane,* and *Listecki* teach that the application of neutral and generally applicable provisions of civil law to determine what constitutes property of the estate in a diocesan chapter 11 case does not implicate the First Amendment or the Church Autonomy Doctrine. *Jones v. Wolf* teaches that this is the approach

that most fully complies with the First Amendment and ensures that the Court is not entangled in resolving religious questions.

This Court's determination regarding estate property is purely secular -- between secular creditors on the one hand, and a church debtor, the Trusts it created and transferred its assets to, and the Parishes, on the other hand. Neutral and generally applicable legal principles under the Bankruptcy Code and New Mexico corporate and trust law enable this Court to resolve the secular disputes raised by the Complaints without entangling itself in internal church government or canon law and without making any decision "on the basis of religious doctrine or practice." *Jones v. Wolf,* 443 U.S. at 602. There is no basis for the application and interpretation of canon law to determine what constitutes estate property or any other aspect of the Complaints. As a matter of law, the Church Autonomy Doctrine affirmative defenses fail and summary judgment disposing of the defenses is appropriate.

D.     **Summary Judgment Must Be Granted Against Defendants on the First Amendment Defense.**

In addition to asserting affirmative defenses under the Church Autonomy Doctrine, Defendants assert a general First Amendment defense: "The Parishes' property rights are protected by the First Amendment to the United States Constitution,[19] thereby barring the relief requested in the Complaint(s)." UF No. 10(f). This defense is untenable.

---

[19] The First Amendment provides, "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. Const. Amend 1.

**1.      As a Matter of Law, the Complaints Do Not Violate the Free Exercise Clause.**

By the First Amendment defense, Defendants ask the Court to conclude that the free

exercise of religion is unconstitutionally burdened by the Bankruptcy Code[20] and New Mexico

law[21] if they result in the assets in the Trusts becoming property of the estate, or if the Parishes'

purported unrecorded beneficial interests in ASF's real property are successfully avoided.  If, as

Defendants contend, they are protected from the Complaints by the First Amendment, this Court

would be constitutionally barred from applying the Challenged Bankruptcy Provisions (including

section 541) and the Challenged New Mexico Provision, to determine the status of the assets in

the Trusts as property of the estate.  Even if ASF intentionally defrauded its creditors by making

massive asset transfers to the Trusts without consideration, this Court would be constitutionally

barred from applying the Challenged Bankruptcy Provisions (including section 544) and the

Challenged New Mexico Provisions, to order the avoidance of such transfers.  Fairly stated,

Defendants' proposed use of the First Amendment in this manner is preposterous.

Countless reported decisions hold that religious entities are bound by neutral and

generally applicable laws.[22] The right of free exercise does not relieve a religious organization of

---

[20] The Committee assumes that the constitutional argument applies to, at the very least, sections 541,542, 544 and 548(e) (the "Challenged Bankruptcy Provisions").  The Challenged Bankruptcy Provisions work together to establish the scope of the estate.  The purpose of the Bankruptcy Code's avoidance and turnover provisions "is to maximize the bankruptcy estate and thereby maximize the recovery for creditors."  *Portland,* 335 B.R. at 864.

[21] The Committee seeks avoidance of fraudulent transfers under New Mexico Statute sections 56-10-18 and 56-10-19 and declaratory and injunctive relief under New Mexico Statute sections 46A-5-505 and 46A-6-603 (the "Challenged New Mexico Provisions"). *See* UF Nos. 6, 8.

[22] *See, e.g., Employment Div., Dept. of Human Resources of Ore. v. Smith,* 494 U. S. 872, 879-882 (1990). Consistent with the First Amendment and religious autonomy doctrine (and over sincerely held religious objections), the government may compel religious institutions to pay Social Security taxes for their employees, *United States v. Lee,* 455 U. S. 252, 256-261 (1982); deny nonprofit status to entities that discriminate because of race, *Bob Jones Univ. v. United States,* 461 U. S. 574, 603-605 (1983); require applicants for certain public benefits to register with Social Security numbers, *Bowen v. Roy,* 476 U. S. 693, 699-701 (1986); enforce child-labor protections, *Prince v. Massachusetts,* 321 U. S. 158, 166-170 (1944); and impose minimum-wage laws, *Tony and Susan Alamo Foundation v. Secretary of Labor*, 471 U. S. 290, 303-306 (1985).

its obligations to comply with a valid and neutral law of general applicability. *Smith*, 494 U.S. at 879 (denial of unemployment benefits based on dismissal for unlawful peyote use did not violate Free Exercise Clause). Moreover, the First Amendment does not require that laws of general application be justified by a compelling governmental interest whenever they burden a particular religious practice. *Id.* at 883.

Under the Free Exercise Clause, "neutral, generally applicable laws may be applied to religious practices even when not supported by a compelling governmental interest." *Burwell v. Hobby Lobby Stores, Inc*., 134 S. Ct. 2751, 2761 (2014) (quoting *City of Boerne v. Flores*, 521 U.S. 507, 514 (1997) ); *Smith*, *supra,* 494 U.S. at 886 n. 3. If prohibiting religion is not the object of a law but merely the incidental effect of a generally applicable and otherwise valid provision, the First Amendment has not been violated. *Id* at 878. Neutral, generally applicable laws, such as the Bankruptcy Code, are subject only to a review for rationality, which requires no more than a showing that the government has a rational basis for the law. *Id.* at 878-79 ("We have never held that an individual's religious beliefs excuse him from compliance with an otherwise valid law prohibiting conduct that the State is free to regulate."); *Church of Lukumi Babalu Aye v. City of Hialeah,* 508 U.S. 520, 531 (1993). Thus, the First Amendment does not relieve a religious organization of its obligation to comply with a valid and neutral law of general applicability on the ground that the law prohibits conduct that religion prescribes. *Smith,* 494 U.S. at 879.

A more exacting standard—strict scrutiny—is reserved for instances in which the law is either not neutral or not generally applicable. *Church of Lukumi Babalu Aye*, 508 U.S. at 546

("A law burdening religious practice that is not neutral or not of general application must undergo the most rigorous of scrutiny;" non-neutral law targeting religious practice violated First Amendment).[23]   Strict scrutiny requires the government to show that there is a compelling interest supporting the law and that the law is narrowly tailored to the ends sought.  *Id.* at 546-47.

The Challenged Bankruptcy Provisions (and the Code in general) and the Challenged New Mexico Provisions are of neutral and general applicability.  *Listecki,* 780 F.3d at 742-744; *In re Newman*, 203 B.R. at 474-75.  This Court has already correctly concluded, "The Bankruptcy Code's fraudulent transfer sections are neutral and of general applicability." Opinion at 11.  None of the Challenged Bankruptcy Provisions or Challenged New Mexico Provisions was drafted to target religious actors, and they do not operate to single out religious actors.  To the contrary, these laws operate neutrally and generally across all debtors and trusts, religious or not religious, who choose to file for voluntary bankruptcy, and all creditors affected by such filings and/or other transferees that might be the target of an avoidance action.  Thus, rational review governs their constitutionality.  That the Challenged Bankruptcy Provisions and the Challenged New Mexico Provisions serve a rational interest is not subject to a principled dispute.

Even if strict scrutiny were applied, the Challenged Bankruptcy Provisions would stand because they serve a compelling interest.  *See supra* at III.B.4 (Bankruptcy Code provisions

---

[23] A law is not neutral if it discriminates on its face by "refer[ring] to a religious practice without a secular meaning discernible from the language or context."  *Church of Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. at 533.  Courts also look at whether the object of the law is a neutral one, examining both direct and circumstantial evidence.  *Id*. at 540.  In terms of general application, all laws are selective to some extent, but "categories of selection are of paramount concern when a law has the incidental effect of burdening religious practice."  *Id*. at 542.  The Free Exercise Clause, at its heart, "protects religious observers against unequal treatment;" in other words, the government "cannot in a selective manner impose burdens only on conduct motivated by religious belief."  *Id*. at 542-43 (alterations and quotations omitted).  If a law is not of general and neutral applicability, courts are required to inquire whether the law is justified by a compelling governmental interest that is narrowly tailored to advance that interest.  *Id*. at 531-32.

serve compelling government interest); *Listecki,* 780 F.3d 746; *In re Newman*, 183 B.R. at 252, and 203 B.R. at 475 n. 4; *In re Meyer*, 467 B.R. at 460-61 (holding that even if strict scrutiny were necessary, the Code withstands "the highest test for constitutionality" and "Congress demonstrated a compelling interest in maintaining an equitable system for the protection of creditors and for permitting debtors to obtain a fresh start from overwhelming debt"). In sum, application of the Challenged Bankruptcy Provisions and the Challenged New Mexico Provisions violates no rights of ASF or the Parishes under the Free Exercise Clause of the First Amendment.

>    **2.     As a Matter of Law, the Complaints Do Not Violate the Establishment Clause.**

Just as the Complaints do not violate the Free Exercise Clause of the First Amendment, they do not violate the Free Establishment Clause of the First Amendment, which provides that "Congress shall make no law respecting an establishment of religion." U.S. Const. amend. I. "At its core, the Establishment Clause enshrines the principle that government may not act in ways that 'aid one religion, aid all religions, or prefer one religion over another.'" *Snyder v. Murray City Corp.,* 159 F.3d 1227, 1230 (10th Cir. 1998) (quoting *Lee v. Weisman,* 505 U.S. 577, 600 (1992) (Blackmun, J., concurring)). After the passage of the Fourteenth Amendment following the Civil War, the United States Supreme Court determined that the Establishment Clause is applicable to the states. *See Everson v. Board of Education*, 330 U.S. 1, 15-16 (1947).

In its Opinion, the Court suggested that Defendants might argue that the Complaints violate the Establishment Clause. Opinion at 10. The Complaints do not violate the Establishment Clause. As the Court correctly observed, the most protective and most cited test

was articulated by the Supreme Court in *Lemon v. Kurtzman*, 403 U.S. 602 (1971). There, the Supreme Court stated that for state action to pass constitutional muster it must meet the following three requirements: (1) it must have a secular purpose; (2) its principal or primary effect must be one that neither advances nor inhibits religion; and (3) it must not foster excessive government entanglement with religion. *Lemon*, 403 U.S. at 612-13.

The Tenth Circuit Court has confirmed that the "purpose and effect prongs" of *Lemon* are to be interpreted "in light of Justice O'Connor's endorsement test." *Weinbaum v. City of Las Cruces, N.M.*, 541 F.3d 1017, 1030 (10th Cir. 2008). "Under the 'endorsement test,' the 'government impermissibly endorses religion if its conduct has either (1) the purpose or (2) the effect of conveying a message that religion or a particular religious belief is favored or preferred.'" *Id.* (quoting *Bauchman v. West High School,* 132 F.3d 542, 551 (10th Cir. 1997)). *Lemon's* excessive entanglement prong comes into play only where the government involves itself with a religious institution. *Weinbaum,* 541 F.3d at 1031. Against this Supreme Court and Tenth Circuit precedent, any defense to the Complaints on the grounds that they violate the Establishment Clause cannot survive summary judgment.

The Challenged Bankruptcy Code Provisions and Challenged New Mexico Provisions easily meet the first two prongs of the *Lemon* test. *See* Opinion at 12. Likewise, these provisions easily satisfy Justice O'Connor's endorsement test. While the Court speculated that the possibility of excessive entanglement may be a factual issue (Opinion at 12), this is clearly not the case. As discussed above, the Court is required to resolve the disputes raised in the Complaints under principals of neutral and generally applicable civil law, which will avoid any

"entanglement" with religious questions. The application of neutral and generally applicable laws to determine a property dispute between secular parties, on the one hand, and religious entities, on the other hand, does not foster excessive government entanglement with religion. To find that it did would preclude the application of any civil law to resolve claims by secular parties against a religious organization.

## IV.
## CONCLUSION

For the foregoing reasons, the Committee requests that the Court: (i) grant this motion for partial summary judgment; (ii) determine, as a matter of law and based on the absence of any genuine dispute as to material facts, that the claims set forth in the Complaints do not violate RFRA, the Church Autonomy Doctrine, or the First Amendment, including the Free Exercise Clause and Free Establishment Clause; and (iii) issue an order that Defendants' Religious Liberty Defenses set forth at UF No. 10(a)-(e) are dismissed.

Dated: March 5, 2021

Respectfully submitted,

PACHULSKI STANG ZIEHL & JONES LLP

By  */s/ Kenneth H. Brown*
     James I. Stang
     Kenneth H. Brown
     Gail S. Greenwood
     150 California Street
     San Francisco, CA  94111
     Tel: 415-263-7000
     Fax: 415-263-7010
     jstang@pszjlaw.com
     kbrown@pszjlaw.com
     ggreenwood@pszjlaw.com

     Counsel for the Official Committee of
     Unsecured Creditors